*248 OPINION OF THE COURT
Mary H. Smith, J.
In this proceeding, petitioner, Alfred T. Renauto, seeks a judgment pursuant to CPLR article 78: (1) reversing, annulling, and setting aside the October 1, 2003 determination by respondent, the Board of Directors of Valimar Homeowners Association, Inc. (the HOA Board), which affirmed an earlier decision of the Architectural Review Board of Valimar Homeowners Association (the ARB) as arbitrary, capricious, an abuse of discretion, affected by an error of law, and not supported by substantial evidence; (2) directing respondent to issue petitioner a building permit; (3) awarding the issuance of fines in the amount of $500 that had been previously imposed and paid by petitioner; and (4) awarding petitioner the costs and disbursements associated with this proceeding.
Factual Analysis
Since January 24, 2001, petitioner has resided at a single-family residence with the address of 103 Amity Court, White Plains, New York (the property). The property is a part of Valimar, a development consisting of 165 single-family homes located in the Town of Greenburgh, County of Westchester. Valimar Homeowners Association (Valimar HOA) is a membership corporation incorporated under the Not-For-Profit Corporation Law of the State of New York. Valimar ARB is a committee of six homeowners that has the responsibility “for reviewing [and approving or disapproving] homeowners’ requests to modify the exterior of their homes.” (Verified petition 1i 4.)
From its inception, the sponsor of Valimar decided that it was in the best interest of all future homeowners to, among other things, preserve the common areas of the development and to create uniformity in appearance of the homes and the home-sites.[1] To further this purpose, the sponsor adopted a “Declaration of Covenants, Restrictions, Easements, Charges and Liens” (the Declaration). (Record, exhibit 1.) Thus, prior to purchasing a home in Valimar, each buyer must agree that the property is subject to the rules and other covenants set forth in the Declaration and the bylaws.[2] These rules limit the Valimar homeowners’ ability to make alterations to their home (particularly with regard to exterior changes) without first obtaining prior written *249 approval from the ARB. For example, the construction of additions is prohibited, and any repairs or replacements to roofs, windows, or siding must have prior ARB approval. (Record, exhibit 3.) Valimar homeowners are even restricted with regard to the placement of outdoor barbeque grills (record, exhibit 3, at 7), and the number of people that may reside in their homes. (Record, exhibit 1, art 1 [i].)
Respondent ARB was appointed pursuant to article VII of the Declaration and is empowered “to act on requests from Homeowners to modify or improve their Homes and Home Sites.” Article VII further provides that “[t]he ARB shall be required to apply certain standards in making its decisions. These standards underlie certain specific guidelines and shall be relied upon in instances where the specific guidelines are vague, ambiguous or nonexistent. These standards and guidelines are more particularly defined and described in schedule D attached hereto and made part hereof.” (Record, exhibit 1, at 12 [emphasis added].) Thus, the ARB’s approval/disapproval determinations are to be guided by the standards set forth in the architectural control guidelines, which are attached as schedule D to the Declaration. (Record, exhibit 3.) Among the standards ARB must apply is the consideration of whether the requested change is in “[hjarmony with Overall Community Design, or Contextual Relationship”[3] (record, exhibit 3, schedule D, at A.1) and whether the “proposed alteration or modification . . . relate[s] favorably to the neighborhood’s planning, landscaping, topography, and existing character.” (Record, exhibit 3, schedule D, at A.2.)
Prior to the instant alterations to the handrails to petitioner’s front steps, petitioner had made a number of prior requests for alterations to be made to the exterior of his home. Indeed, petitioner’s experience with the approval process is well documented and is set forth as exhibits to the affidavit of Bryan *250 K. Hao,[4] sworn to March 19, 2004 (Hao affidavit), which was submitted in opposition to the petition. In that affidavit, Mr. Hao attaches letters between petitioner and the sponsor of Valimar, as well as between petitioner and Katonah Management Group (acting on behalf of the ARB). (Hao affidavit, exhibit A.)
Petitioner’s first exterior change occurred shortly after he moved into his home in February 2001. Thus, in a letter dated February 22, 2001 from the sponsor to petitioner, the sponsor responds to petitioner’s request to install a satellite dish and notes that petitioner’s request is belated given the fact that an examination of his property revealed that the satellite dish had already been installed. More importantly, in this letter, petitioner is advised that “in accordance with the Offering Plan, as approved by the Attorney General, we the Sponsor reserve the right to approve or reject the location of any proposed additions or modifications to the exterior of the homes at Valimar. Although we do approve of the location that the satellite dish has been installed, we strongly advise against this type of action on your part in the future. If you or any Homeowner at Valimar proceed[s] with exterior improvements that we have not approved, you will be subjected to the additional expenses of having them removed or altered to meet our approval.” (Hao affidavit, exhibit A.)
Three months later, in May 2001, petitioner decided that he wished to make another exterior alteration to his home and submitted an application requesting permission to install an awning. (Hao affidavit, exhibit A, letter dated May 11, 2001.) Then in July 2001, petitioner submitted another application to install Belgian block along the edge of the driveway and garden area, which was rejected. (Hao affidavit, exhibit A, letter dated July 10, 2001.) Shortly after his Belgian block request, in July 2001, petitioner submitted a proposal to modify his walkway, front steps and rear patio. That request (which precipitated petitioner’s request for the instant wrought iron handrails) was approved by letter dated September 7, 2001 from Katonah Management. In that letter, Mr. Hao advised petitioner that he must comply with his original submission (a copy of which was attached) and petitioner was further admonished in the following manner: “Should you wish to change the installation, you *251 must submit your requested change to the Board before any work is done.” (Hao affidavit, exhibit A, letter dated Sept. 7, 2001 [emphasis added].) Finally, in a letter dated March 18, 2002, Katonah Management criticized petitioner for having installed a swing set on his property and again advised petitioner that “[a]s you know, any exterior structure or modification requires the prior written approval of the Architectural Review Board (ARB).” (Hao affidavit, exhibit A.) Mr. Hao also advised petitioner that he was being assessed a $100 fine in accordance with the notice that had been provided in June 2001 to all homeowners. That notice had advised Valimar homeowners as follows:
“Some homeowners may not be aware that prior approval by the Architectural Review Board is required before any modification to the exterior of your home is initiated. This includes, but is not limited to satellite dishes, patio extensions, deck installations, or the installation of fences . . .
“All requests should be submitted in writing to Katonah Management Group who will forward the application to the ARB for review. The ARB seeks to respond to all requests within 30 days. Please allow adequate time between the time you submit your application and the date by which you hope to install your home improvement. The Board has adopted a fine of $100 for installation or modification that requires Board approval but occurs prior to the [time the] ARB has acted upon the request.” (See Hao affidavit, exhibit A, notice dated June 2001, entitled “Valimar Homeowners Association, Inc.”.)
Despite the fact that petitioner had obtained approval for the modifications to his front walkway, front steps and rear patio in September 2001 (petition, exhibit B), the work did not commence until June 2002. It is petitioner’s contention that
“[s]hortly after the work was completed your petitioner contacted Brian K. Hao of Katonah Management (‘Katonah’) which is the property manager for the Valimar Development, regarding the installation of wrought iron hand railings along the new front steps and landing area of the Property. During this conversation, Mr. Hao advised that no approval was necessary, as long as the color was consistent with the color of the house. His response was consistent with the Valimar ARB Guidelines *252 (Ex. A), which make no mention whatsoever of railings being subject to Valimar ARB approval. I advised Mr. Hao that the railings would be the standard color (black), or possibly grey, the color of the house.” (Verified petition 1Í 8.)
Petitioner further avers, however, that after petitioner purchased the railings, and just prior to installing them at the beginning of August 2002, petitioner called Mr. Hao as a courtesy to tell him that the railings were being installed, at which point Mr. Hao
“inexplicably stated that he had no recollection of our prior conversation, and advised that the railings must be approved by the Valimar ARB. I advised him that the work was being done that day, based upon his prior representation that no approval was required. He requested your petitioner to forward a rough sketch of the railings via facsimile, and advised that he expected no problem with the railings being approved . . . Since the contractors were at the site that day, and I would be subject to an additional expense for them to come back a second time to perform the labor for the installation, I advised Mr. Hao that the work would be completed based upon his prior representation.” (Verified petition If 9.)
A few days after petitioner’s telephone call with Mr. Hao, on August 5, 2002, petitioner sent to Katonah Management, via facsimile, a survey showing the location for the proposed handrails and a sketch depicting a side view of the handrails. (Verified petition, exhibit C.) On the facsimile cover sheet, petitioner wrote that it should be construed as a request for approval by the ARB and further specified that the railings would be painted “grey to match the house and pavers or black.” (Id.)
By letter dated August 21, 2002, the ARB’s decision (rendered on Aug. 13, 2002, see record at 5) denying petitioner’s railings request was conveyed to petitioner by Katonah Management. (Verified petition, exhibit E.) The letter further advised petitioner that he was required to remove the railings within 30 days of the date of the letter, and that he could apply for approval of a different type of railing (i.e., “A PVC or wood post and rail system similar in design to the front white picket fences”) if he so desired. (Id.)
Understandably, not satisfied with the alternative proposed for a wood or PVC railing, petitioner requested over the next *253 several months (i.e., Sept. 2002-Mar. 2003) that the ARB revisit the issue. However, petitioner was continuously advised by Katonah Management that the style of the railings had not been approved and their immediate removal was required. In a letter dated April 7, 2003 from Katonah Management, Mr. Hao explained that
“[s]ince the assessment of the penalty, I have placed this matter as a point of information on each Board agenda. At their meeting on April 1, 2003 the Board specifically upheld its decision to continue assessing fines until the railing is removed . . . Absent an application for [the PVC or wood post and rail system] or the removal of the existing wrought iron railing, the Board has stated that it will not revisit this issue. I hope that this explanation makes clear the Board’s position and will assist you in complying with their decision.” (Record, exhibit 13.)
In response, by letter dated June 24, 2003, petitioner appealed the ARB’s decision to the HOA Board pursuant to the offering plan, schedules A and D. (Petition, exhibit K.) The bases for petitioner’s appeal were threefold. First, the ARB was without authority to regulate the installation of handrails and their design since the guidelines do not contain a provision regulating the installation of handrails. Second, the denial and recommendation to use PVC or wood post and rail system was inconsistent with the guidelines since the recommended solution would be unsafe, whereas “[t]he wrought iron railings are anchored, sturdy and strong.” (Verified petition, exhibit K.) Third, that the ARB’s decision was arbitrary because the ARB had engaged in selective enforcement of the regulations regarding outside alterations.[5]
At its meeting of July 21, 2003, the HOA Board unanimously affirmed the ARB’s denial of petitioner’s requested handrail alteration. (Record, exhibit 18, at 1-2.) “Thereafter, on September 25, 2003, the Board again considered [petitioner’s] continuing demand that they review the ARB’s decision and *254 again voted to uphold the decision of the ARB and its own decision regarding imposition of fines.” (Hao affidavit 1115.) By letter dated October 1, 2003, Katonah Management advised petitioner that the Board had “affirmed its decision to uphold the [ARB’s] . . . decision to not permit the installation of the black wrought iron railing.” (Petition, exhibit L.) In an effort to explain the ARB’s prior denial of his request to install Belgian block, Katonah Management invited petitioner to reapply for permission since the Belgian block “became an accepted standard after your original application.” (Id.) Katonah Management also explained away some of petitioner’s other examples of selective enforcement (e.g., the wrought iron railing on the sponsor’s original house) by stating that “[a]s you know, Valimar has initiated new standards for the community since the ARB control passed to the homeowners. I suspect that as time passes more standards will be adopted further clarifying what is and what is not acceptable in the community.” (Id.)
Legal Discussion
In support of his petition, petitioner asserts the following arguments in favor of this court’s nullifying the respondents’ decisions regarding his handrails. First, the ARB did not have the authority under the ARB guidelines to approve or disapprove petitioner’s installation of handrails since the ARB guidelines “make no mention whatsoever of railings being subject to Valimar ARB approval.” (Petition K 8.) Therefore, the ARB “has proceeded without and in excess of their jurisdiction (in violation of [CPLR 7803] subdivision 2).” (Verified petition 1118.) Second, petitioner relied on Mr. Hao’s verbal advice that “no ARB approval was required for the railings” and, accordingly, since Mr. Hao “is the principal of the managing agent. . . Respondents employ . . . [Respondents] are bound by his representation [and] . . . should be estopped from claiming that ARB approval was required for the installation of the railings” (petitioner’s reply affirmation 1Í1Í 4-5; verified petition 1111 8-9, 21-23). Third, that the business judgment rule does not insulate respondents’ determination because the rule is limited to “actions of a cooperative board.” (Petitioner’s reply affirmation 1Í16.) Fourth, that there is no rational basis for respondents’ determination and it should be set aside as arbitrary, capricious and lacking substantial evidence.[6]
*255 The ARB Had the Jurisdiction Over the Handrails
The court does not agree with petitioner’s argument that because the guidelines do not specifically deal with handrails on the front steps of houses, handrails are exempt from ARB review. A review of the Declaration, bylaws and guidelines makes clear that one of the main reasons for adopting these rules is to create a uniformity in the outside appearances of the homes and homesites. This uniformity extends all the way down to the “community style mailboxes,” which are the “only style that is approved and permitted.” (Record, exhibit 3, guidelines 1i 13.) Thus, as set forth in the above factual recitation, all Valimar homeowners must apply to the ARB for any proposed modification they wish to make to the exterior of their homes. And while the guidelines specify the standards to be applied to certain specific exterior alterations (i.e., antennas, window air-conditioners, flagpoles, awnings, tennis courts, basketball backboards, dog runs, electronic insect traps, fences, landscaping, outdoor lighting, sprinklers, holiday lights/statues, mailboxes, patios, barbeques, driveways, playground equipment, roofing/ siding, security devices, sheds, shutters, signs, security systems, storm and screen doors, windows, pools, and remodeling in general (which includes decks, porches and screened porches), this listing is not exhaustive. Indeed, the Declaration makes clear that there will be instances where the alteration requested is not covered by a specific guideline, and, in those instances, the ARB is required to apply the nebulous standards set forth in the guidelines in making their determination (e.g., contextual relationship, compatibility, etc.).
Finally, it is evident that petitioner was well aware of the requirement to get ARB approval concerning exterior alterations *256 since he had previously applied to the ARB with regard to his request to modify his front walkway, front steps[7] and rear patio (as well as his earlier requests to install a satellite dish, awnings and Belgian block). (See Hidden Ridge at Kutsher’s Country Club Homeowner’s Assn. v Chasin, 289 AD2d 652 [2001].) Based on the foregoing, the court finds that the addition of the wrought iron handrails to petitioner’s front steps falls within the ambit of an alteration requiring ARB approval even though the handrails to the front steps of a house are not specifically mentioned in the guidelines. (See, e.g., Andrew Jackson Condominium v Gomez, NYLJ, June 28, 1988, at 25, col 2; Captain’s Walk Homeowners Assn. v Czeczil, 2003 NY Slip Op 51383[U] [2003].)
The Business Judgment Rule Controls the Propriety of Respondents’ Decisions
As noted above, the rights of the Valimar homeowners to change their homes and homesites are somewhat limited compared to the rights of your average homeowner. Thus, the rules that the Valimar homeowners have agreed to abide by are in addition to the rules a typical homeowner must abide by in connection with a town’s zoning code. In this respect, the Valimar homeowners’ rights (even though they are owners in fee simple) are similar in many respects to the rights of cooperative and condominium homeowners since their property rights concerning exterior alterations are circumscribed by the Declaration, bylaws and guidelines. As described by one court, these reduced rights are a necessary evil to arrangements such as these that require cooperation among the property owners for the good of the complex:
“Every man may justly consider his home his castle and himself as the king thereof; nonetheless his sovereign fiat to use his property as he pleases must yield, at least in degree, where ownership is in common or cooperation with others. The benefits of condominium living and ownership demand no less.” (Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 537 [1990], quoting Sterling Vil. Condominium, Inc. v Breitenbach, 251 So 2d 685, 688 [Fla 1971].)
The conflicts that necessarily arise in such situations were addressed by the New York Court of Appeals as follows:
*257 “As this case exemplifies, board decisions concerning what residents may or may not do with their living space may be highly charged and emotional. A . . . condominium is by nature a myriad of often competing views regarding personal living space, and decisions taken to benefit the collective interest may be unpalatable to one resident or another, creating the prospect that board decisions will be subjected to undue court involvement and judicial second-guessing. Allowing an owner who is simply dissatisfied with particular board action a second opportunity to reopen the matter completely before a court, which — generally without knowing the property — may or may not agree with the reasonableness of the board’s determination, threatens the stability of the common living arrangement.” (Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 539-540 [1990].)
Because of these competing interests, the New York Court of Appeals in Levandusky decided to adopt a new standard of review to be applied to decisions of a cooperative board — namely, the business judgment rule. And while petitioner is correct in his assertion that the New York Court of Appeals decisions in Matter of Levandusky v One Fifth Ave. Apt. Corp. (75 NY2d 530 [1990]) and later in 40 W. 67th St. v Pullman (100 NY2d 147 [2003]) involved cooperative boards, given the similarities inherent in cooperatives, condominiums and even fee simple townhouse arrangements (with homeowners’ associations as the governing boards), courts have uniformly extended this standard to decisions made by condominium boards and communities governed by homeowners’ associations. (See Kloppenburg v Loftus, NYLJ, Nov. 13, 1996, at 35, col 3; Drayer v Hidden Ponds Homeowners Assn., Inc., NYLJ, June 29, 1990, at 34, col 4;[8] Hidden Ridge at Kutsher’s Country Club Homeowner’s Assn. v Chasin, 289 AD2d 652 [2001]; Van Camp v Sherman, 132 AD2d 453 [1987]; Captain’s Walk Homeowners Assn. v Czeczil, 2003 NY Slip Op 51383[U] [2003].) Accordingly, the court finds that *258 the business judgment rule to be the appropriate standard of review for this proceeding.
The business judgment rule requires that
“Mo long as the board acts for the purposes of the [condominium], within the scope of its authority and in good faith, courts will not substitute their judgment for the board’s. Stated somewhat differently, unless a resident challenging the board’s action is able to demonstrate a breach of this duty, judicial review is not available.” (Levandusky, 75 NY2d at 538; see also 40 W. 67th St. v Pullman, 100 NY2d 147 [2003].)
However, a court may review “improper decisions, as when the challenger demonstrates that the board’s action had no legitimate relationship to the welfare of the [development], deliberately singles out individuals for harmful treatment, is taken without notice or consideration of the relevant facts, or is beyond the scope of the board’s authority.” (Id. at 540.)
Against this backdrop, the court turns to petitioner’s arguments. Because of the need to ensure that declarations, bylaws and regulations are strictly followed, courts routinely require the removal of renovations and the restoration of the area to its original condition when a condominium owner fails to obtain the necessary board approval. (See, e.g., Board of Mgrs. of Heritage Hills of Westchester Condominium 8 v Fenninger, 142 AD2d 622 [1988]; Lawrence Park Condominium v Karabachi, NYLJ, Mar. 15, 2000, at 30, col 6; Captain’s Walk Homeowners Assn. v Czeczil, 2003 NY Slip Op 51383[U] [2003].)[9] And courts are loathe to disregard strict compliance with the requirement of written consent, even in the face of allegations similar to the *259 ones petitidner makes herein — i.e., that a representative of the ARB advised him that no approval was required.
For example, the business judgment rule prevented the court from second-guessing a decision by a condominium board that the installation of a whirlpool in a condominium without the prior written consent of the board was a violation of the condominium’s bylaws, rules and regulations. In that case, as here, the homeowner argued that consent was not required because the whirlpool could not be deemed an appliance within the meaning of the bylaws. The court, however, found that the whirlpool fell within the definition of an appliance and that defendant’s failure to comply with the bylaws required that she remove the whirlpool from her condominium.
Moreover, the court dismissed defendant’s argument that the plaintiff’s denial of her postinstallation application was arbitrary, capricious and unenforceable and stated that the court was limited in its review to: “(1) whether the Board of Managers acted on behalf of the condominium; (2) whether the Board of Managers acted within the scope of its authority; and (3) whether the Board of Managers acted in good faith.” (Lawrence Park Condominium v Karabachi, NYLJ, Mar. 15, 2000, at 30, col 6, at 31, col 1, citing Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 538 [1990].)
The Lawrence Park court held that the first two requirements of the business judgment rule were satisfied by the fact that the review and denial of the whirlpool application were required by the bylaws and, therefore, that the board had acted within the scope of its authority as “ ‘gatekeeper’ to insure that various unit owners not install . . . appliances that might overload the circuitry” (Lawrence Park Condominium v Karabachi, supra at 31, col 1). With regard to the good faith requirement, the court held that it is the unit owner’s burden to prove “that an activity undertaken by the Board of Managers has no legitimate relationship to the welfare of the condominium, deliberately singles out individuals for harmful treatment, is taken without notice or consideration of relevant facts, or is beyond the scope of the Board’s authority.” (Lawrence Park Condominium v Karabachi, supra at 31, col 1.) Because the defendant failed to show bad faith and because the remaining standards had been satisfied, the court issued a preliminary injunction enjoining further renovations and requiring that the property be restored to its original condition.
*260 Here, all the requirements for the application of the business judgment rule have been met. As set forth more fully above, respondents’ decisions were made with the welfare of Valimar in mind, and were based on their desire to enforce the rule which requires ARB approval for all exterior alterations. Despite the probable superiority in terms of safety, the ARB decided that wrought iron handrails were not acceptable — most likely from an aesthetic standpoint.
As discussed supra, the second factor — whether respondents acted within the scope of their authority — is met by the fact that the handrails were an exterior alteration that had to be approved by the ARB. This decision was entirely within the ARB’s purview and can be justified by the rather broad standards the ARB may apply in deciding whether a proposed alteration is acceptable (e.g., whether the proposed alteration is “compatible” and/or fitting within the “contextual relationship”). Petitioner’s failure to obtain the ARB’s written approval was a breach of the Declaration, bylaws and guidelines; respondents are justified in their position that the handrails must be removed.
Finally, with regard to the third factor, whether the decision was made in good faith, pursuant to Levandusky, it is petitioner’s burden to prove that the respondents’ action “has no legitimate relationship to the welfare of the [development], deliberately singles out individuals for harmful treatment, is taken without notice or consideration of the relevant facts, or is beyond the scope of the board’s authority.” (Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 540 [1990].) Petitioner’s reliance on the ARB’s approval of the wrought iron handrails on the side and back of the house located at 116 Eden Court is unavailing since there is a distinction with handrails being located at the back of the house — where they are not visible from the street — as opposed to handrails located on petitioner’s front steps. Courts routinely deny a finding of bad faith through selective enforcement unless the governing board had previously approved an identical alteration. Accordingly, petitioner has failed to sustain his burden of showing that the respondents’ decision was in bad faith insofar as petitioner was singled out for unfair treatment. (See, e.g., Board of Mgrs. of Ocean Terrace Towne House Condominium v Lent, 148 AD2d 408, 409 [1989] [defendants ordered to remove air conditioner built through exterior wall of condominium unit because “there (was) no evidence in the *261 record to support the conclusion that the plaintiff was acting in bad faith by enforcing the bylaws or that the plaintiff had regularly waived this particular bylaw as it applied to other unit owners”]; Board of Mgrs. of Manhattan Val. Townhouses v Murovich, 273 AD2d 11, 11 [2000] [defendant ordered to remove plexiglass installed over gates encompassing a common element vestibule without prior board approval as “no issue of fact as to waiver (by Board’s failing to enforce rule with other tenants was) raised absent any evidence of a plexiglass installation to a unit configured like defendants’ unit”]; Cannon Point N. v Abeles, 160 Misc 2d 30 [1993] [no selective enforcement found with regard to cooperative’s house rule regarding the installation of washing machines and dryers]; Merolo v Board of Mgrs. of Hills at Grasmere Condominium II, 3 AD3d 520 [2004] [“condominium’s architectural guidelines were not selectively enforced against the plaintiff”].)
While petitioner suggests that respondents’ agent (Bryan Hao) advised him that no approval was required and that he detrimentally relied on that statement, given petitioner’s past dealings with the ARB, such a claim is not supported by the evidence. Here, petitioner was well aware that all exterior alterations required ARB approval based on his prior written submissions for approval of a satellite dish, awnings, Belgian block, walkway, patio and front steps. Furthermore, he knew that the request for approval had to be in writing addressed to the ARB and had to contain detailed drawings concerning the proposed changes. Given the foregoing, even if Mr. Hao made such a representation, petitioner would not have been justified in relying on that representation. Furthermore, such a detrimental reliance would have only involved the purchase of the handrails, since petitioner’s later action of installing the handrails was done when he was well aware of the fact that he needed ARB approval and had not yet obtained such approval. While the court appreciates petitioner’s frustration with the ARB’s decision given that the handrails at issue are aesthetically pleasing and are probably safer, the court is not in a position to usurp the ARB’s authority and substitute its judgment in this matter.
Based on the foregoing, it is hereby ordered that petitioner’s petition is dismissed with prejudice and petitioner is ordered to *262 remove the contested handrails located on the front steps of 103 Amity Court, White Plains, New York.[10]

. Homesite is defined in the Declaration as “the parcel of land on which a Home may be or has been constructed.” (Record, exhibit 1, at 3.)

. The Declaration incorporates by reference the bylaws of the association. (Record, exhibit 2.)

. The guidelines further define contextual relationship as “pertain[ing] to the characteristics of any existing structures, the neighborhood, and the individual lot. An element of design which may be acceptable in one instance may not be acceptable elsewhere in the Valimar community, where the Association will have a need for more conformity to adjacent property, including the Common Improvements, by way of example. To harmonize in its contextual relationship, a design must be compatible.” (Record, exhibit 3, schedule D, at A.l.) The guidelines then define compatibility as “an agreeable relationship in, and in some instances actual continuity of; architectural style, mass, proportions, rhythm, scale, quality of design and materials, and similar uses of materials, color, and design details.” (Id.)

. Mr. Hao is a principal of. Katonah Management Group, Inc. Katonah Management Group has been the managing agent for Valimar HOA for the past four years. It is the business of Katonah Management to manage cooperatives, condominiums and homeowners associations. (Hao affidavit 111.)

. In this regard, petitioner pointed out that (1) wrought iron railings had been installed at another home owned by Spectrum; (2) the rule precluding basketball backboards in cul-de-sacs and that portable hoops be stored inside garage when not in use was never enforced and was eventually eliminated; (3) the rule against holiday statutes or decorations on the homes or the homesites was not enforced; (4) petitioner had made a request to install Belgian block which was rejected by the ARB, but, subsequently, another Valimar homeowner’s request to install Belgian block on his driveway was approved; and (5) some homes had installed fences on common driveways. (Petition, exídbit K.)

. According to petitioner, the decisions were arbitrary and capricious for the following reasons: (1) there were no specific findings of fact supporting the *255 October 1, 2003 decision (verified petition UU 24-25); (2) respondents’ decision “was totally inconsistent with Valimar Guidelines outlining the relevant factors for consideration with respect to said application” (verified petition U 28); and (3) respondents’ decision was “wholly inconsistent with their decisions with respect to other homes located in Valimar Complex” (verified petition U 32) (i.e., the builder’s home located at 61 Primrose Court which has a wrought iron handrail on the front steps and another home located at 116 Eden Court which has a wrought iron railing system along steps “that line the side and rear steps” of that house). (Petitioner’s reply affirmation UU 7-13.) With regard to this last argument, it appears that the builder’s handrail was installed prior to the Valimar HOA’s appointment of the ARB as the approval body for alteration requests. Therefore, the railing located at 61 Primrose Court cannot provide a basis for petitioner to argue that he was unfairly singled out with regard to the ARB’s denial of his request to install wrought iron handrails.

. The court notes that the guidelines do not appear to specifically address alterations to the front steps, but petitioner nevertheless recognized the need to obtain approval from the ARB with regard to this alteration.

. In holding that the business judgment rule applied to decisions of a homeowners’ association, the court in Drayer v Hidden Ponds explained that “[t]he Homeowners’ Association is nothing more than a hybrid of the other ownership. Here, as in the condominium and cooperative ownerships, all common properties are operated for the benefit of the residents. The same quasi-fiduciary relationship exists here as in the former two.” (Drayer v Hidden Ponds Homeowners Assn., Inc., supra at 34, col 4.)

. See also Board of Mgrs. of Hudson View W. Condominium v Hudson View Towers Assoc., 182 AD2d 404 (1992) (Court properly ordered defendant to remove produce stand from arcade which was part of the common elements of the condominium); Board of Mgrs. of Manhattan Val. Townhouses v Murovich, 273 AD2d 11, 11 (2000) (defendant ordered to remove plexiglass installed over gates encompassing a common element vestibule without prior board approval as “no issue of fact as to a waiver [by Board’s failing to enforce rule with other tenants was] raised absent any evidence of a plexiglass installation to a unit configured like defendants’ unit”); Andrew Jackson Condominium v Gomez, NYLJ, June 28, 1988, at 25, col 2 (defendant enjoined from performing additional work on condominium ordered to restore exterior walls and windows to their original condition based on failure to obtain prior Board approval); Board of Mgrs. of 77 Park Ave. Condominium v Silver, NYLJ, July 10, 1985, at 7, col 3 (defendant ordered to restore wall in condominium to its original condition based on failure to obtain Board approval).

. The court notes that given the ARB’s change regarding the use of Belgian block, it is foreseeable that the ARB could change its position on wrought iron railings (given their superior safety) in the future, and petitioner should consider holding on to the handrails in the event such a change in standard transpires.